**MARTINEZ, Appellant,**

v.

**OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES et al., Appellees.**

[Cite as *Martinez v. Ohio Dept. of Adm. Serv.* (1997), 118 Ohio App.3d 687.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 96API06–772.

Decided March 13, 1997.

*James C. Thompson,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Larry Y. Chan,* Assistant Attorney General, for appellees.

BOWMAN, Judge.

Appellant, Robert S. Martinez, began employment with appellee, the Ohio Civil Rights Commission ("OCRC"), in January 1990, in Toledo, Ohio as a Civil Rights Field Representative I. In December 1990, appellant transferred to OCRC's Cincinnati office at the Goodall Complex in downtown Cincinnati, where he continued to perform the same tasks as he had in Toledo.

Appellant had been in the office a very short time when he wrote an interoffice communication to OCRC's Regional Director, Margaret Moran, explaining that, while at work, he experienced symptoms similar to natural gas or carbon monoxide poisoning, which he attributed to something in the ventilation system, perhaps from the bakery on the first floor of the building. Appellant felt that Moran should be aware of the situation.

On January 7, 1991, appellant consulted Dr. D. Ann Middaugh, an occupational health specialist, about his symptoms, which included shortness of breath, aching lungs, wheezing, hoarse voice, sore throat, headaches, nose irritation and fatigue. As a result of her examination, Dr. Middaugh was concerned that appellant suffered from problems related to "sick building syndrome."

On January 14, 1991, Dr. Middaugh and her team did a site visit to the Goodall Complex. Their report found that there was "evidence of inequity in [the] ventilation system and questionable adequacy of fresh air intake" and recommended that a National Institute of Occupational Safety and Health ("NIOSH") Indoor Air Quality Questionnaire be administered.

NIOSH conducted its investigation on June 13 and 24, and September 25, 1991, recommending that various steps be taken to reduce complaints related to indoor environmental conditions, including replacing and changing filters and insulation; cleaning coils, troughs and pans; consulting the manufacturer of the air handling units to reduce humidity; removing and replacing water-damaged carpeting; and repairing water incursions around windows.

In addition, the Goodall Complex's landlord engaged Environmental Enterprises, Inc. to perform a site investigation, which was conducted on February 21 and March 1, 1991. This report recommended a change in the building's ventilation

system. As a result of this report, the landlord ordered renovations on the building's ventilation system, which occurred during the week of June 24, 1991. During the renovations, large, portable air-filter machines were brought in to keep the dust down during construction; however, once construction was completed, the air-filter machines were removed. While the air-filter machines were in place, appellant noticed an improvement in his symptoms.

In the interim, appellant saw Dr. Middaugh on May 22, 1991, complaining of dizziness, eye irritation, sore throat, hoarseness, chest tightness, pain around his chest wall, severe nausea and passing out. In addition, appellant indicated that he was depressed because of his symptoms and lack of productivity, and that he had seen a psychiatrist, who placed him on Prozac, but that he had not taken the medication. As a result of this visit, Dr. Middaugh wrote a letter to Moran concerning appellant, in which she stated:

"I have had the opportunity to re-evaluate Robert Martinez at the Occupational Health Clinic today. He has medical complaints that are consistent with problems caused by inadequate ventilation and indoor air pollution problems at his site of employment in the Goodhall [*sic*] Building. Longterm [*sic*] exposures to indoor air pollutants have the potential for causing permanent medical problems.

"It is my medical recommendation that *he be removed from his current work location and re-assigned* to an area where indoor air pollution is not a problem. Further, I recommend that this be a *permanent re-assignment* until it can be proven that the indoor air quality problems have been resolved at his current place of employment." (Emphasis added.)

On June 11, 1991, at OCRC's request, appellant was seen by Dr. Jonathan A. Bernstein, who determined that appellant did "not have an allergic component that could be contributing to the etiology of his symptoms." Dr. Bernstein recommended that an environmental sampling for molds, dust and dust mites be performed at the Goodall Complex.

On July 5, 1991, appellant filed a request for accommodation with OCRC, asking for "[i]nstallation of air-filtering equipment." The request states that the reason for the request was "sick building syndrome" and that medical information was attached.[1] Appellant then went on an extended leave. Upon return to work, appellant learned that OCRC had not addressed his request for accommodation. Appellant repeated his request in an interoffice communication to Moran dated August 23, 1991, in which he stated:

---

1. Moran testified that she did not remember receiving medical information attached to appellant's request for accommodation.

"Yesterday in the mail I received notification from the Industrial Commission that my claim has been approved based on indoor air-pollution. In light of this finding, I must again request that indoor air-filtering machines be implemented as soon as possible.

" * * *

"I have recently returned from an extended leave only to encounter the same indoor air-pollution with a resulting deterioration of my health. * * * Please inform the building management of the Industrial Commission's finding and an answer to our request for air-filtering machines."

By interoffice communication to her staff dated September 4, 1991, Moran responded to appellant, stating that she and the Executive Director of OCRC, Joseph Carmichael, were "continuously working toward the elimination of problems within the working environment." A written request was submitted to the landlord to reinstall the air-filtering/dehumidifier machines, and Moran and Carmichael also were evaluating other reasonable steps to be taken to resolve the problem.

Later, in answer to appellant's interrogatories, OCRC stated that Moran requested reinstallation of the air-filtering machines because appellant specifically asked for them to be reinstalled. When the landlord refused to comply with Moran's request, Moran did not pursue the issue with the landlord because she was informed that the air-filtering machines were placed in the building only during air conditioning duct maintenance and that, once the maintenance had been completed, there was no further need for the air-filtering machines.

On December 30, 1991, appellant was again seen by Dr. Middaugh, who signed a form indicating that appellant should be off work from December 31, 1991 until February 28, 1992, an estimated return-to-work date. A handwritten note at the bottom of the form states:

"May not work at current location because of illness caused by indoor air quality problems. *May work if relocated to another building.*" (Emphasis added.)

As clarification of her note, Dr. Middaugh stated in her deposition:

"I was called by Nancy Stir [OCRC Human Resources Director] * * * [i]ndicating that she was trying to accommodate a work restriction to relocate [appellant]. And he had advised them he could not work until February 28, 1992 regardless and I said, no, so long as he was relocated, he could work."

On January 3, 1992, Moran wrote to appellant informing him that, beginning January 6, 1992, he was to report to work at the Middletown satellite office of OCRC. Moran stated that appellant was being assigned to this work site because

Dr. Middaugh requested that he be relocated. The letter concluded that appellant's failure to report as reassigned could result in disciplinary action. Because appellant did not want to drive the distance to Middletown, he informed Moran during a phone conversation that he would not go to the Middletown satellite office. Moran asked appellant to put his intentions in writing, which he did, stating:

"Due to a denial of my requests for a reasonable accommodation for my handicap, I am hereby forced to resign my position as a Civil Rights Investigator with the Ohio Civil Rights Commission effective January 6, 1992."

Thereafter, appellant filed a complaint with the Equal Opportunity Commission ("EOC") and an OCRC charge of handicap discrimination and constructive discharge. After an investigation and hearing, the EOC issued a finding of no probable cause. The OCRC charge was assigned to the Dayton regional office for investigation, and the investigator recommended a finding of no probable cause to believe that handicap discrimination had occurred. Appellant applied for reconsideration of this decision, which was denied.

Appellant then filed this cause of action in the Ohio Court of Claims, ultimately asserting that OCRC knowingly segregated and discriminated against its handicapped workers by assigning them to another city, thus depriving them of a reasonable accommodation and their right to enjoy benefits and privileges equal to nonhandicapped employees. The Court of Claims held a bifurcated trial on the issue of liability only and found that OCRC did not discriminate against appellant because of his handicap and that transferring him to the Middletown satellite office was a reasonable accommodation. Appellant now brings this appeal and asserts the following assignments of error:

"Assignment of Error No. 1:

"The trial court committed error when it failed to find that plaintiff-appellant's request for an accommodation to allow him to continue working was reasonable and the defendants-appellee [sic] failed to sustain the burden of proof to show that the request constituted an undue hardship on them.

"Assignment of Error No. 2:

"The trial court committed error when it reassigned plaintiff-appellant to another office staffed only with handicapped employees.

"Assignment of Error No. 3:

"The trial court committed error in transferring plaintiff-appellant to the Middletown office because it was not a reasonable accommodation."

Appellant's assignments of error will be considered together, as they all relate to appellant's assertion that the trial court erred in finding that OCRC's action in relocating him to the Middletown satellite office was a reasonable accommodation.

R.C. 4112.02 provides:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the * * * handicap * * * of any person, * * * otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

To prove a prima facie case of handicap discrimination, it must be shown that the complaining party was handicapped; that action was taken by the employer, at least in part, because the complaining party was handicapped; and that, even though the complaining party is handicapped, he can safely and substantially perform the essential functions of the job in question with reasonable accommodation. *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 25 OBR 331, 496 N.E.2d 478; *Asplundh Tree Expert Co. v. Ohio Civ. Rights Comm.* (1991), 68 Ohio App.3d 550, 589 N.E.2d 102.

This court notes that whether appellant is handicapped was never an issue in this case. OCRC answered one of appellant's interrogatories as follows:

"6. Please list if at any time defendant questioned the authenticity of plaintiff's handicap and discussed their concerns regarding authenticity with the plaintiff. If so, please give the dates, the names of the person(s) questioning, and the basis for the defendant to question plaintiff's authenticity.

"Authenticity of Plaintiff's handicap not questioned."

In addition, the Court of Claims assumed, for purposes of its decision, that appellant is handicapped. Thus, the first prong of proving a prima facie case is satisfied.

With regard to the second and third prongs, the evidence shows that OCRC moved appellant to the Middletown satellite office because of appellant's handicap. On January 2, 1992, Dr. Middaugh told the Human Resources Director for OCRC that appellant could work as long as he was not required to work in the Goodall Complex. There was never any question that appellant was capable of performing his job duties and, in fact, he had received a promotion in November 1991, which he turned down because of his concerns about his health and how it was affecting his performance. In addition, appellant received numerous letters of thanks from both employers and complaining parties praising him for a job well done. The problem was that appellant could not perform his job in the Goodall Complex because of his health. The second and third prongs

of *Hazlett* are satisfied and, thus, the question becomes whether OCRC's moving appellant to the Middletown satellite office was a reasonable accommodation of appellant's handicap.

Ohio Adm.Code 4112–5–02(A) defines "accommodation" to mean "a reasonable adjustment made to a job and/or the work environment that enables a qualified handicapped person to safely and substantially perform the duties of that position." In *Wooten v. Columbus, Div. of Water* (1993), 91 Ohio App.3d 326, 333–334, 632 N.E.2d 605, 610, this court stated:

"Reasonable accommodations include but are not limited to job restructuring, acquisition or modification of equipment or devices, realignment of duties, revision of job descriptions or modified and part-time work schedules. * * *

" * * *

"Reasonable accommodation includes both reasonable modification of the duties of the existing position, if feasible, and transfer, reassignment, or hire into a vacant position the handicapped employee can perform both physically and by qualification." See, also, *Degnan v. Goodwill Industries of Toledo* (1995), 104 Ohio App.3d 589, 662 N.E.2d 894; Ohio Adm.Code 4112–5–08(E)(2).

This court also stated that accommodations for handicapped employees are unreasonable only if they place an undue hardship on the employer and that the burden of showing undue hardship is on the employer. *Wooten.* See, also, *Greater Cleveland Regional Transit Auth. v. Ohio Civil Rights Comm.* (1989), 58 Ohio App.3d 20, 567 N.E.2d 1325; Ohio Adm.Code 4112–5–08(E)(1) and (3).

Appellant asserts that, as an accommodation, he requested installation of air-filtering equipment, and not that he be reassigned to the Middletown satellite office. Appellant asserts that OCRC should have installed the air-filtering equipment, rather than reassigning him, since it did not demonstrate that installing the air-filtering equipment would be an undue hardship to it.

In *Ansonia Bd. of Edn. v. Philbrook* (1986), 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305, the Supreme Court addressed the issue of reasonable accommodation with respect to religious discrimination. The case is similar to the case at bar, in that the plaintiff's suggestion for a reasonable accommodation was different from the accommodation selected by the school board. In holding that the school board's accommodation was reasonable, the court stated, at 68–69, 107 S.Ct. at 372, 93 L.Ed.2d at 315:

"[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship. * * * [T]he extent of undue hardship on the employ-

er's business is at issue only where the employer claims that it is unable to offer *any* reasonable accommodation without such hardship." (Emphasis added.)

■ In this case, OCRC made an effort to have the landlord reinstall the air-filtering equipment; however, the landlord stated that the equipment would not be reinstalled because the work on the air ventilation system had been completed. While OCRC attempted to have the landlord accommodate appellant's handicap, this court notes that it was OCRC's responsibility as appellant's employer to accommodate appellant's handicap. Ohio Adm.Code 4112–5–08(E)(1). OCRC could not delegate this responsibility to the landlord.

While it might have been preferable from appellant's point of view for OCRC to reinstall the air-filtering equipment itself, OCRC was not required to choose this avenue as its means to reasonably accommodate appellant. It was OCRC's option to choose to accommodate appellant by other means, such as reassigning him to its satellite office in Middletown. Pursuant to *Ansonia Bd. of Edn.*, that accommodation is deemed to be reasonable and OCRC did not have to demonstrate that installing the air-filtering equipment was an undue hardship.[2]

■ Our next inquiry is whether, by assigning appellant to the Middletown satellite office, OCRC discriminated against him. In *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 20 O.O.3d 200, 421 N.E.2d 128, the Supreme Court adopted a model of proof formulated through federal case law interpreting Title VII of the Civil Rights Act of 1964 for cases concerning an alleged violation of R.C. Chapter 4112. That model of proof initially requires that the plaintiff prove a prima facie case of discrimination by a preponderance of the evidence. Once the plaintiff has met this burden, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason to rebut the presumption of discrimination established by the plaintiff. If the defendant successfully articulates a legitimate, nondiscriminatory reason, the plaintiff is required to prove, by a preponderance of the evidence, that the employer's articulated reasons are a pretext for impermissible discrimination. See, also, *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817,

---

2. This court notes that, had OCRC stated that it could not reasonably accommodate appellant in any way, then appellant would have had an opportunity to make suggestions for possible accommodation. See *Mantolete v. Bolger* (C.A.9, 1985), 767 F.2d 1416, 1424, wherein the court stated:

"While the burden of persuasion in proving inability to accommodate always remains on the employer, once the employer presents credible evidence that accommodation would not reasonably be possible, the plaintiff has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."

36 L.Ed.2d 668; *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207.

This court notes that whether only handicapped individuals were permanently assigned to the Middletown satellite office [3] is not an issue, as OCRC answered one of appellant's interrogatories as follows:

"10. Please list all employees who have been re-assigned (not rotated) to Middletown from Cincinnati. Please indicate which employees are handicapped, briefly describe their handicap, the date of reassignment, and if defendant reimbursed the re-assigned employees for their transportation expenses and/or were allowed the use of the defendant's official vehicle.

"Stewart Newstate (disabled) and Marla (Hall) Shoecraft (disabled) were re-assigned to the Middletown office in 1992 and 1991 respectively. Neither person was reimbursed for transportation expenses. Ms. Shoecraft never requested use of the state car, Mr. Newstate did, and was denied its use on a full time basis."

There is also evidence in the record that Vivian Muldrow, who has also had problems as a result of the air quality at the Goodall Complex, was to be reassigned to the Middletown satellite office; however, the reassignment was not carried out because she has a driving restriction. Muldrow continues to work in the Goodall Complex.

During OCRC Dayton office's investigation of appellant's complaint, Newstate, Shoecraft and Muldrow were interviewed. Newstate and Shoecraft, both of whom have bronchial asthma, had their attending physicians advise OCRC that they could not work at the Goodall Complex. As a result, both were reassigned to the Middletown satellite office, albeit at different times.

At the time of the respective reassignments, each asked if other working arrangements could be made in Cincinnati, instead of commuting to Middletown, but the requests were denied. When Newstate asked if he could use the state car to commute to Middletown, he was told no because a state car was not available for his exclusive use. On the other hand, Shoecraft was offered a state car, but turned it down because it did not have a cellular phone in it, which she wanted in case of a car breakdown.

As a result of their reassignments to the Middletown satellite office, both Newstate and Shoecraft now have one- to one-and-one-half-hour commutes, whereas their commutes to the Goodall Complex were ten to fifteen minutes. Neither is reimbursed for mileage or the additional wear and tear on their

---

3. The evidence also shows that there were other handicapped employees who remained employed at the Goodall Complex.

vehicles. Because lunchroom facilities are unavailable at the Middletown satellite office, each must purchase lunch.

Because the majority of their work involves Cincinnati residents, business often takes Newstate and Shoecraft to Cincinnati; however, if the work is completed prior to quitting time, they must return to the Middletown satellite office. Often their clients are disgruntled because they must make long-distance phone calls in order to reach Newstate and Shoecraft. Despite their circumstances, both Newstate and Shoecraft are held to the same standard of production of cases each quarter.

Both Newstate and Shoecraft indicated that, due to financial and family considerations, they could not resign their positions with OCRC. In addition, since they were given no other options, they were forced to accept reassignment to the Middletown satellite office.

From this evidence, appellant has demonstrated a prima facie case of discrimination, since only handicapped employees work at the Middletown satellite office and they are treated differently from other OCRC employees. However, OCRC articulated a legitimate, nondiscriminatory reason to rebut the discrimination established by appellant.

The evidence shows that it was Dr. Middaugh, appellant's treating physician, who stated that appellant could not work at the Goodall Complex, but could work if he was relocated. She stated this as early as May 22, 1991. The same was true for Newstate and Shoecraft, both of whom also were treated by Dr. Middaugh. Thus, the reason that all three employees were moved to the Middletown satellite office was the request of their physician. It should be noted that Dr. Bernstein also stated that the only action that could have been taken to alleviate appellant's symptoms was to remove him from the environment, meaning to remove appellant from the Goodall Complex. Neither Dr. Middaugh nor Dr. Bernstein suggested anything about installing air-filtering equipment; rather, both recommended that appellant be removed from the building. Both opined that, if appellant was relocated, he was capable of performing his job.

OCRC already had a satellite office in place in Middletown and, thus, it was a logical choice to relocate appellant there since, according to appellant's physician, appellant needed to be relocated from the Goodall Complex. The Middletown satellite office was already functioning as an extension of the Cincinnati office. The Middletown satellite office was the locale most convenient to the Cincinnati office that did not require appellant to relocate to another city and another OCRC office. Further, OCRC was not required to find another work site within Cincinnati or make other arrangements in Cincinnati to accommodate appellant. OCRC was required to accommodate appellant only by re-assigning him away from the Goodall Complex. Once the accommodation was offered and it fulfilled

appellant's physician's requirements, it was a reasonable accommodation pursuant to *Ansonia Bd. of Edn.* While traveling to Middletown was not appellant's preference, appellant was unable to prove that OCRC's articulated reasons for moving appellant to Middletown were a pretext for impermissible discrimination. Rather, the evidence demonstrates that OCRC was willing to accommodate appellant in accordance with his physician's request so that he could continue his employment. It was appellant who refused to participate in OCRC's attempts to accommodate him in another, already existing, job location. See *Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 678, 622 N.E.2d 1130, 1136–1137.

OCRC was very much aware of the fact that a number of its employees were experiencing health problems as a result of working at the Goodall Complex. To that end, OCRC had Dr. Middaugh and NIOSH do on-site investigations to determine causes for the employees' complaints. In addition, the landlord had an independent firm conduct a study of its own. While all three groups agreed that something was causing problems for the OCRC employees, no group could pinpoint an exact cause. Thus, it was difficult for OCRC to rectify the problems the employees were having; however, OCRC never refused to accommodate appellant, nor did it question whether appellant was handicapped.

This court finds that, under the circumstances of this case, appellant's relocation to the Middletown satellite office constitutes a reasonable accommodation under the law. The relocation complied with Dr. Middaugh's recommendation. Whether OCRC could have taken other measures to accommodate appellant is not the issue.

Based on the foregoing, appellant's three assignments of error are overruled, and the judgment of the Ohio Court of Claims is affirmed.

*Judgment affirmed.*

TYACK, P.J., and LAZARUS, J., concur.